Okay, U.S. v. Fi, Zeku. May it please the court, my name is Mary Ann Worth and I represent Beckham Fiskew on this appeal. Your honors, when the officer here handcuffed Mr. Fiskew, after patting him down, after separating him from his vehicle, he turned a Terry stop, based only on reasonable suspicion, into an arrest without probable cause. In doing so, he violated core Fourth Amendment principles, tenets that have long held that there should be no arrest without probable cause. And while this court has recognized that there are rare, unusual exceptions when a police officer is permitted to handcuff during a Terry stop, none of those exceptions apply here. And to expand those rare exceptions to cover facts, like in the case here, would undercut core Fourth Amendment principles that prohibit arrest without probable cause. This court should reverse Mr. Fiskew's conviction because it was secured based on evidence that was obtained in violation of the Fourth Amendment. The guiding principles that have been set by this court hold that during a Terry stop, of course the police may frisk, but their investigation has to be as minimally intrusive as possible, bearing in mind the circumstances that gave rise to the suspicion. And what are those circumstances here? They're very minimal. They're based on intuition. There's a possible lie about whether a car was broken down. The driver- You see that only as a possible lie? At the time that the officer is- He said that he was waiting for a tow truck, that he had a transmission problem, he was pulled off on a dirt road, and moments later the car was on the road moving. I understand that. But at the time that the officer sees him, it's a possible lie. It feels funny. His antennae are wiggling. It's clearly correct. He's near an empty house. Sorry. No, go ahead. He's near an empty house. We know it's late at night. And he's seen minutes later in the company of two other individuals. Let me go through this timeline with you just to make sure that I've understood your position properly. This park and ride was in a rural, deserted location, right? It's off 684. I've seen the pictures. It looks like it's covered with trees. Covered with trees. It's the middle of the night. Yes. There were three suspects. Yes. And the officers had no way of knowing that there weren't other suspects around. Right. Or did they have some way? All those trees. I would dispute that, Your Honor. I think that it is very speculative and borderline absurd to assume that these men would have intuited or predicted that the police would be there, and therefore they must hide in the woods and get ready for that, or that they would secrete weapons somewhere. There's no basis in the record for that whatsoever. There was no way that they would know that weapons hadn't been hidden in the vicinity, right? Why would they be? There's no reason in the record to believe that that would ever happen. Did anybody testify one way or another on this? Did any witness suggest that that was a concern? There's nothing in the record to show that there was reason to suspect that weapons would be secreted in that area. Indeed, common sense. I wasn't asking about to show. I was asking whether there was evidence presented on that question, on the concern that weapons might have been hidden in the vicinity. No, Your Honor. I think that that's something that the district court judge discussed in distinguishing Bailey. And what were the police to make of the fact that at the first encounter there was one individual in the car, and then moments later after the car miraculously recovered from its transmission problems, there were two other individuals who appeared? I think it was in several minutes. Isn't that right? There were two other individuals. One was walking around the car. That was my client. Another was in the car, the pathfinder, right? Certainly. That had not been apparent. I mean, there had been just an encounter with a single individual at the first. Again, you know, it caused reason to be suspicious, but it's certainly not evidence of criminal activity. But doesn't it also emphasize, though, as Judge Cabranes is pointing out, that there were unknown actors and unknown factors based on the rural nature of the area. It was one in the morning, I think, and there were a lot of woods. So did the people come from the woods? Did they come from another car? And, you know, immediately there were disparate stories that were being told by the three individuals. That was afterwards. That's afterwards. But there's no evidence of criminal activity, and I would contract to this. That's not the issue here, right? I mean, everyone agreed below, and if there's ever a case that shows that sometimes it's actually clear what status there is between a hunch and probable cause that's called reasonable suspicion, everyone agrees that there was a reasonable suspicion that justifies a terrorist act and that there was not probable cause that would justify an arrest, right? Right. So we don't have to worry about evidence of criminal activity here. We know exactly what was allowed and what wasn't allowed. Generically, the question is, does the handcuffing amount to a reasonable security precaution that is part of a terrorist act, or does that escalate this to an arrest? Right. And that goes to the issue of is there reason to believe there's a physical threat. Now, again, could you just clarify the timeline for me? I thought that the officer spotted the car while it was driving, not in the park-and-ride. Is that wrong? That's correct. He was circling back. So he circled back, and he sees the car driving, and then he follows it to the park-and-ride. He turns around and follows him. And when he gets to the park-and-ride, there's already one person out of the car? One person, my client, is walking. From the record, it sounds like he's walking around towards the back of the car, and two people are in the car, including the original driver. And the officer did not testify, unless I'm mistaken, please correct me because I'm not sure of this, that he saw the car driving with three people in it. There's nothing in the record that I recall that says that. So he sees the car moving. He follows it to the park-and-ride. By the time he gets into the park-and-ride lot, there's two people in the car and one person out of the car. But I think he did testify that there was no time for someone to get in the car between the time that he pulled in, that he saw them going into the park-and-ride and he pulled in. There was no time for that to take place. Right, but in terms of this speculation or thought process about whether there were people in the woods, it's not clear, is it, that your client, who was spotted outside the car, got out of the car as opposed to came out of the woods, is there? No, but the officer testified there was no time for anybody to get out of the car. He was following right into the parking lot. So I don't think there's any reason in the record to support that someone could have come out of the woods. And I would just, in my remaining time, just very quickly turn the court's attention to the recent decision in Grice, where this court just last September made it very clear that it is only in rare, unusual circumstances where it is allowed to handcuff during a Terry stop without turning that into an arrest. And the examples, Vargas, Newton, all cases where there's specific evidence of a threat, someone's armed with a gun, someone has a gun and threatens murder. Grice itself, where the person is poised with a remote control device near tracks, where innocent bystanders, there's nothing like that here. There's no evidence of a complaint, no evidence of criminal activity, no evidence of arming. And I would say that if the unusual circumstance is extended to this case, any time someone is stopped in a dark, wooded area, be it Bedford or somewhere else, or in the projects in the middle of the night, the rationale that there could be Confederates around, that there could be weapons stashed, will always hold true. And that means that Terry is gone and we can handcuff at will. And that would be a violation of the Fourth Amendment. Can you actually testify that this was his standard practice during a Terry stop? Yes, Your Honor. His subjective reasoning doesn't perhaps matter, but that may suggest some reason for your concern that if we, you know, there's either a pretty firm line against handcuffs or there's not, because once you start making a lot of exceptions on an ad hoc basis, maybe officers start deciding that that's going to be their common practice. Yes. I would just, if I could have 30 seconds. Oh, please. Thank you. I just want to address the second point about the career offender. If we reach that issue. Let's finish it, and you'll be able to do that. Okay. Let's try to finish some of these interesting timeline questions, which I think are quite important. Now, Sergeant Gruppuso, when he first saw Jajaga, Jajaga was alone, right? Yes. I just want to make sure I understand. But minutes later, we have two new suspects who had appeared, right? He sees the car pull into the parking lot. He sees one person circling towards the back. I'm not sure exactly at what point, but eventually he realizes that there's another person in the car. So there are how many people in the car? Two in the car, one walking around the back. All right. As far as he's concerned, there are two new persons that he couldn't understand where they had come from. I mean, that's reasonable, right? We can agree on that. Except that he did say that it was clear there wasn't enough time for them to enter the car. Yeah. As far as he was concerned, he had only seen the first fellow, Jajaga, and now there are two others. That is correct. Why would a reasonable officer in these circumstances not be worried that there might be even more persons around somewhere? I mean, given that particular setting, wouldn't a reasonable officer wonder if there are two new inexplicably persons who have appeared without explanation, why wouldn't he be concerned that there might be a third or a fourth who would appear? No, there's nothing in the record to indicate that there were other cars there, that anyone was lurking around. And my point is- I'm sorry. There was one other car there. Pardon me? Wasn't there a second car? There was one other car there. That's correct. Yeah. What about that car? You know, it says in the record that it belonged to Jajaga's family, I think. And I think the officer touched it and it was cold to the touch. That's all I remember from the record about that car. But as I said earlier, I think it would be speculative and borderline absurd. Well, let's assume for the argument that Jajaga was arrested or effectively arrested unconstitutionally. How does that deprivation of Jajaga's rights affect the rights of your client? Because the search of the car flows from the illegal handcuffing and it's fruit of the poisonous tree and it would be suppressed. Did Jajaga, whom we're assuming had his rights violated in some sense, did he not consent to the search? There's an issue on the voluntariness of that that I've raised. But, yes, he did utter the words, you can look. What finding did the court make with regard to Jajaga's consent to the search? That it was voluntary. Okay. And the issue of standing, we're not supposed to call it standing anymore. When I was in law school, we called Fourth Amendment standing of your client to challenge the search. Am I wrong that that's a live issue in the case? That that was somehow pretermitted by the conditional plea? I don't think so. No, I think the car clearly was in the name of Mr. Fiske's family. And I can't imagine that he didn't have standing to challenge that. Challenge the search of the car. That's exactly right. You wanted to make . . . I would, yes. Just turning to the career offender issue for a moment. I've raised a couple of arguments. One based on the Tenth Circuit recent decision in O'Connor and the other based on the Fourth Circuit's decision in McCollum. Explaining why the crime of conspiracy to commit hop sack robbery is broader than the definition of the crime of violence in the guidelines. And for that reason, my client is not a career offender. Regarding the issue of what the government has raised that the judge said, well, it doesn't matter because I would have given him this sentence anyway, I would point out the following. First of all, it is very clear from the record that the judge selected and said so a midpoint between the non-career offender guidelines and the career offender guidelines in selecting the sentence of 108 months. Therefore, he based his sentencing decision on the upper limit of the career offender guidelines. Well, he identified the guidelines. He described them. And then he described how he reached the decision having adverted to what we know to be advisory guidelines. So he takes full account of his options and then makes a decision based on his informed discretion. But he selected, he specifically said the reason I picked this sentence, I chose the midpoint between career offender and non-career offender guidelines. Which are 70 to 87 months as non-career offender, 151 to 181, an egregious difference double. And the Supreme Court authority is clear that my client would be entitled to be sentenced as a non-career offender. It's a huge consequence for him. And I would submit, I've been doing this a long time at the district court level as well. I've never seen anybody who pled guilty. Where the offense is non-consummated receive a sentence so high above the guidelines. The career offender guidelines obviously dictated the result here. And for that reason, I would ask if we reach that point for a remand for resentencing. Thank you very much. Thank you, Your Honor. Good morning. May it please the court. My name is Robert Allen and I represent the United States on appeal. I want to focus on the issue of the Terry stop, although I'm of course happy to answer questions about the sentencing guidelines. This is an extremely compelling timeline. The sergeant detective in this case, his name is Grappuzzo, runs into a vehicle pulled over on the side of the road at around 1.15 in the morning. He tries to help, so he asks the driver if he needs any help. He observes that the driver is by himself, and the driver says, I'm from Stanton Island, which is hours and hours away from where they were up in Bedford. He says, I have a tow truck coming from Brooklyn, which makes no sense why you'd have a tow truck coming from an area three or four hours away. He said he had a friend who had a tow truck. Correct. You know, not everybody belongs to AAA, and not everybody has the money to pay for a tow. If you have a friend with a tow truck, you might wait quite a few hours for him to come rather than pay for a tow. It's certainly plausible, but it's also certainly, I think, grounds for suspicion. Again, this is not- I mean, the whole thing is grounds for suspicion. That's agreed, right? It's agreed, stipulated. Everybody says there was reasonable suspicion justifying a Terry stop. There was not probable cause for an arrest, right? Yes. So the question is, what is it that justifies the security concern that would warrant handcuffing in a Terry stop situation such that we would conclude that despite Bailey, this is a case in which handcuffing is justified as part of a Terry stop? Yes. So just two quick, very quick key points from that initial encounter. One, only one person in the car. And two, the officer knows that there is an empty, vacant house nearby, which he knows- That's what gives the reasonable suspicion. To believe that there's a possible burglar or home invasion robbery. Now, when they get to the park and ride, when the officer gets into the park and ride and initiates the stop, he sees another person in the car, and he sees a person behind the car, right? So there are a couple of inferences that he's allowed to draw from this and that the district court found were appropriate inferences to have been drawn. One, Jajaga, who was the driver, lied, obviously. He lied about having transmission trouble. And he did not, although I don't think he was specifically asked, he never notified the officer that there was another person with him. And the fact that there was another person in the car means there was someone outside on the side of the road doing something, which the officer naturally infers is preparing for or conducting or being about to conduct a burglary or a robbery. Second, there's another person who is not in the vehicle. It's possible he had just gotten out of the vehicle. It's also possible he was there waiting in the park and ride the entire time. So the officer concludes that this could be a staging point for the robbery. It could be where people were planning to meet up afterwards. And if that's the case, there may be more people who are there, maybe sitting in a parked car. There could be more people who are going to come later, right? He doesn't know who else was there, and it's not obvious to him where this third person, Fisaku, came from. So the key difference between this case and between Bailey is that Bailey is a very controlled situation. It is a stop that the officers conducted at a location the officers chose, which was right outside of a fire station. It was by a firehouse in a presumably suburban neighborhood where there would be other people around, but where there would also be lights and visibility. It's a regular street. Yeah, in the middle of the day, and it's a place where it couldn't have been a staging ground. There's no reason to think that anyone associated with the defendants would be nearby. But here, by necessity- Evidence that the two people who were in the car matched the description of a man who had a gun at a previous occasion, which gave grounds for a probable cause search warrant of the house from which these people had come. Yes, and two- There's a considerable basis, I should think, for concern about whether there's a gun somewhere in the vicinity in Bailey. Correct, and two responses to that, Your Honor. One, here, this is also a case that involves a crime that commonly is conducted with weapons. So I think in this case as well- Burglary of an empty house is commonly done with guns? I think it's the type of crime that commonly involves weapons, yes. And- The whole point is this was a vacant house. That's why the officer thought that that house might be the subject of a burglary, is because it was vacant. Do burglars normally bring guns to houses that they think are uninhabited? Your Honor, the district court found that the officers had a reasonable concern that there would be weapons involved, and in fact, there were weapons in- Yeah, that's the . . . after the fact, we might have reason to think that these guys were trying to rob a drug dealer because they were all set up as police officers, to . . . but we didn't know . . . no one knew that at the time. We can't be confused by the facts. By the after-the-fact facts. We're focused on what the officers knew at the time. You mentioned home invasion as well as a possibility, which to me suggests that there are occasions in which individuals are in a house that is then invaded and things taken, and that would suggest a need for arms, potentially. Was there any basis for that? Did he testify that his concern was based solely on the vacant house? Look, the officers in this case, as many officers are in numerous instances, are operating without perfect vision and perfect clarity into what's happening. What gives the officer the initial concern about a home invasion, robbery, or burglary is the fact that he knows there are vacant houses nearby, but he also, I think, has a concern, more generally, about burglaries and robberies. That concern is proven by, first, the fact that Jajaga has obviously admitted that there is a person who is outside the vehicle at 115 in the morning. That person is presumably scouting out a robbery. Once the officer here finds the robbery tools, the fake guns, NYPD merchandise, he actually has other officers canvas all nearby houses, not just the vacant home. Although I think what causes . . . The tool after the fact, right? It is. It is after the fact, but it speaks to the reasonableness of the inference that the court drew, which is that there was concern here that this was a violent offense and that there might have been weapons that were secreted in the location or held in the possession of the defendants. Do you think that we overstated the matter in Grice in saying that circumstances in which handcuffs might be used in connection with a Terry stop are unusual? I think, Your Honor, it's hard to say, obviously, because I don't have statistics on the average Terry stop. I think the average Terry stop does not come anywhere near this type of situation, and obviously we're not . . . The average Terry stop is people on the sidewalk and officers on the beat kind of thing, but I wonder about the average Terry stop in Bedford. I wonder, you know, maybe we make assumptions about what's average and what's not. It's normal based on where we happen to live, but for these officers, I would imagine they're very often encountering suspects in cars, on roads, in leafy areas. That's not so unusual for them. There's nothing in the record as to these questions, so I'm not sure. I would imagine that an officer in Bedford probably conducts far fewer Terry stops than an officer in the city. I'm just trying to figure out what we should be saying one way or another, what you would like us to say, for example, and what the defense would like to be said about handcuffs and Terry stops. Well, Your Honor, I think that this was . . . if you were to consider Terry stops overall nationally, this is an unusual Terry stop. This certainly is. For all the reasons that we've already stated, and so I don't think there's anything incorrect with saying that, generally speaking, the use of handcuffs is unusual. Although, I think when . . . The defense counsel suggests that if we were to find that this search, even after the pat-down, after the two additional officers have come, even after the pat-down, even after the individuals are put in separate police cars for interrogation, I think it's at that moment that they're handcuffed, right? They're in the backseat of police cars. They're segregated and it's kind of man-on-man, but the police are armed and they know that the individuals are not. With the woods around or not, if we were to uphold it in this circumstance, isn't defense counsel correct that we'd be basically authorizing the use of handcuffs when there was reasonable suspicion to support a stop? Don't you always have that kind of safety concern? Well, Your Honor, I think that the key difference here is that there was a legitimate concern that there may have been other people who would be coming to the scene of the stop. Why wouldn't that always be so if someone was stopped in a high-crime neighborhood as well? Well, again, in Bailey, for example, the stop occurred at a location of the And just the presence of a high-crime neighborhood is not the same type of specificity of the suspicion here where people seem to have been caught in the midst of committing a crime and then immediately went to a particular location where another individual seems to have met them. Did the prior apparent untruth, lie, trying to mislead the officer also set the scene in a different way, maybe? Well, it does. It certainly heightens the suspicion. Again, this court doesn't need to make general pronouncements as to when handcuffs are and are not appropriate, but I think under the specific facts here, the district court's findings were correct that the officers had a concern about their own safety. They had a concern that other people might come to the scene, that there could be weapons hidden on the scene, weapons in other cars or in Jajaga's own car. Also, I think one other important difference is that the purpose of this stop was one that was not going to be completed immediately, and this is a difference in Bailey. In Bailey, the purpose of the stop was substantially to identify who the people were who were leaving the house, to see if one of the guys who had stopped was Polo, who had sold drugs to the informant. What I think is a problem in Bailey is that that purpose is accomplished before the handcuffs are even put on. The two individuals identify themselves, and then Polo says, I came from my house. Frankly, at that point, he should have been arrested because given the probable cause in the search warrant, it was plainly arrestable, and the attempt to continue asking questions in the context of a Terry stop, I think, was inappropriate. But here, to complete the objectives of the Terry stop, which is to determine whether, in fact, a robbery had occurred, it's going to take a little bit more time. You're going to need to separate the individuals. You're going to need to ask them questions. In that context, it would be impossible for the officers to control the scene while at the same time leaving . . . Wait a second. Why would it be impossible for them to control the scene? The individuals are called for backup. There are three officers. They're armed. They've patted down the individuals to confirm that they're not armed. They're in the back of the police cars, which presumably are locked, though I guess the record is not clear about that. I don't know that you can run easily from the police car. Don't they have an obligation to use the least restrictive means available? Yes. I mean, the point of Terry is to use the most minimally intrusive means capable of protecting the officer's safety. But on the other hand, the cornerstone of the Fourth Amendment is reasonableness. In SHARP, the Supreme Court has instructed courts not to second guess the snap judge that's made by officers, but rather to ask, even if there was a better way to have done this, whether what had occurred was reasonable under the circumstances. While it may have been possible for the officers to ensure their safety through a lesser invasive means, I don't think it's possible to say that what occurred here was unreasonable, given the ambiguity and the difficulties of knowing whether anyone else was going to come to the scene, whether there were weapons at the scene, whether a robbery has been in progress. And again, when folks are caught in the midst of a crime, that's a highly volatile situation where they may want to escape. They may want to try to overpower the police. And so, I do think under the specific facts here, Judge Inglemeyer was correct to find that the use of handcuffs for a limited period of time, again it was under ten minutes, under ten minutes. Yes, I was going to ask you about that. Is that under ten minutes? Yes, the duration of the stop, which was determined by comparing radio runs, was approximately ten minutes. And we've had cases, of course, on that particular issue, we've had thirty-three minutes, twenty-two minutes, sixty-two minutes. But let me ask you about the Bedford Police Department. Is it the practice of the Bedford Police Department to handcuff all suspects who are being detained or who are being stopped? I don't know, Your Honor. Didn't Officer Grupposo say that was his practice? Officer Grupposo testified that, I think he said it was his practice, yes. It wasn't developed because his subjective intent is not relevant to the determination. I understand that. The issue is whether, even if he does this all the time and he shouldn't do it all the time and most of the time he's violating someone's rights, if in this instance a reasonable officer could have used handcuffs legitimately because that was what a reasonable officer would do, there's no violation here. I get that. But you see, the problem is, and you said earlier, maybe we don't need to make pronouncements about the use of handcuffs. The problem is we kind of did. In Bailey, we made a pretty strong statement about handcuffs being a line of demarcation and then in Grice, we may walk that back a little bit and say there might be unusual exceptions. One issue is, are we giving any guidance at all in these cases? Is it valuable to have some sort of rule or is it important that we walk this rule because it isn't a very good rule if it turns out there are going to be quite a number of types of circumstances in which handcuffing is appropriate? I'm a little concerned about what we say here, both in terms of what we do with our precedents and in terms of whether there is some value to having meaningful guidance to officers about what they're allowed to do during a Terry stop and what they're not. I certainly understand the concern, Your Honor. One thing I'll note is that this stop occurred in September of 2014, which I believe that Bailey was decided in 2014. I'm not sure what month. Grice was obviously decided well after. I don't think it's possible to tell from the facts of this case whether those decisions have subsequently provided guidance to officers. Again, this is a stop that occurred now over three years ago. Thank you very much. Thank you. Ms. Worth? Just a few things. I was listening to the government and the language that they use in describing what the officer knew here, worse like possible, could be a staging point, maybe more people, all very speculative, very thin level of reason to believe that a physical threat is imminent. Again, I would just compare what the officer knew here with what the officer knew in Grice, the cases cited in Grice, and in Bailey as well. Just briefly, the point that the officer didn't choose this location, which is one of the things that the district court relied upon. In my experience, they don't often get to pick the location where a stop occurs. If that's the case, why not just follow them and choose your location and avoid this whole situation? I would just go back to my original point. When you think about the ramifications of this decision, put it in the projects. An officer . . . I wanted to ask you about that. Yes. Why doesn't your argument cut the other way? These are not the projects. This is a wooded area, late at night, in a suburban area. Why isn't it, in a sense, a stronger case for the police than you would find in the proverbial projects case? Actually, I don't think so because I think in the projects, the likelihood that guns are stashed, that Confederates are lurking everywhere is very strong. In this situation, it is, in my opinion, absurdly speculative that somebody would be hiding in the bushes or guns would have been stashed somewhere in anticipation of this arrest. Thank you very much. Thank you. We'll reserve the decision. Thank you both for excellent arguments.